UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| BIBLE CLUB AND R. G. A MINOR BY AND THROUGH HER NEXT FRIEND R. G., <br><br> Plaintiffs, <br><br> vs. <br><br> PLACENTIA-YORBA LINDA SCHOOL DISTRICT, DENNIS SMITH, DAVE FLYNN, AND OTHER UNKNOWN PERSONS ("DOES 1-15") <br><br> Defendants. | Case No.: SACV 08-837 CJC (PLAx) <br><br><br> ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

## I.  INTRODUCTION

Plaintiffs R.G. and Bible Club (collectively "Bible Club") seek a preliminary injunction against Defendants Placentia-Yorba Linda Unified School District ("District") and Esperanza High School ("EHS") requiring the District to grant the Bible Club the same access to EHS facilities and resources enjoyed by other clubs. After carefully considering the evidence presented by the parties, the Court finds the issuance of a preliminary injunction appropriate and necessary. The Bible Club has shown that EHS

has created a limited open forum by admitting student clubs, like the Red Cross Club and Students Making a Difference ("SMAD"), that are not related to the school curriculum. Because it has created a limited open forum, EHS is compelled to grant equal access to the Bible Club under the First Amendment of the United States Constitution and the Equal Access Act ("EAA"), 20 U.S.C. § 4071, a statute that codifies high school students' rights to form clubs.

Although schools have discretion in framing and developing their curricula, First Amendment protections extend onto campuses. "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Ind. Sch. Dist.*, 393 U.S. 503 (1969). The *Tinker* Court also recognized that the schools' educational function is not limited to rote classroom instruction, but extends to more informal interactions between students.[1] This freedom, for students to choose between participation in diverse clubs and to shop in the marketplace of ideas, furthers one of the schools' most important educational missions: to develop leaders and citizens capable of democratic participation. *Id.* at 512.

The First Amendment and the EAA bar a public school from discriminating against religiously oriented or politically oriented speech if it creates an open forum. However, a school may legally maintain itself as a closed forum, keeping a tight grip on students' activities by allowing only those groups directly related to the curriculum to meet on campus. The extent of that grip, however, can undermine a school's larger educational mission. In a time when other outside influences, many negative, vie for high school students' attention, it makes no sense for a school to narrow its

---

[1] "The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the educational process. A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions... [.]" *Tinker*, 393 U.S. at 512-13.

overwhelmingly positive extracurricular and co-curricular offerings by preventing students from organizing new clubs or keeping groups like the Bible Club off campus. In any event, to enforce the EAA and to protect the Bible Club's First Amendment rights, the Court must issue a mandatory injunction directing EHS to grant the Bible Club the same access to EHS facilities and resources enjoyed by other clubs.

## II.    BACKGROUND

### A. The Bible Club

In May, 2008 Plaintiff R.G., then a sophomore at EHS, and three other EHS students applied to the school to form the Bible Club. (Verified Compl., Ex. A, Proposed Bible Club Charter ("Proposed Charter").) The Bible Club's proposed purpose was "to study the Bible and other related pieces of literature." (Proposed Charter.) The Bible Club planned to provide volunteers to soup kitchens at Christmas and Thanksgiving. (Proposed Charter.) It also procured a faculty advisor. (Proposed Charter.) R.G., who would have served as the Bible Club's founding president, desired to use the club as a forum to discuss diverse issues, including faith and religion, human sexuality, human rights, and bullying and taunting. (Compl. ¶ 21.) R.G. desired to worship, pray, study the Bible and other literature, and enjoy fellowship together with other students at Bible Club meetings. (Compl. ¶ 20.) R.G. also wished to use the club as a platform to plan specific ways to feed the poor, help the homeless, and protect the weak and vulnerable in society. (Compl. ¶ 21.) On May 28, 2008 EHS Activities Director Jason Kaylor denied the Bible Club's charter, citing board policy 6145.5. (Proposed Charter.) Soon thereafter, while other approved EHS student groups have been preparing for the fast-approaching 2008-2009 school year, the Bible Club filed this action.

### B. Clubs at EHS

At least 32 student clubs or groups were recognized by the EHS yearbook for the 2007-2008 school year. (Compl. Ex. C., Clubs and Organizations Index from EHS' 2007-2008 Yearbook ("Index").) The Index reveals a variety of activities and clubs available to EHS students.[2] The District's policy governing the admission of student clubs states:

> All such clubs and organizations must have a relationship to the curricular and instructional programs, and the purposes, and/or objectives shall be an extension of a specific program or course offering.

(Def.'s Mem. of Points and Authorities in Opp'n to Pl.'s Mot. For Prelim. Inj. ("Def's Mem.") Ex. 1, Policy on Student Clubs and Organizations.)

After the Bible Club filed this action, the District reviewed the status of clubs at EHS to determine if EHS was in compliance with District policy. (Second Supp. Decl. of Dr. Dennis Smith in Opp'n to Mot. for Prelim. Inj. ("Smith Decl. 2") ¶ 7.) District Superintendent Smith conducted the review because he believed EHS' practice of allowing certain groups on campus while restricting others might have been unconstitutional. (Def.'s Mem. at 1.) However, after reviewing the groups on campus, Dr. Smith determined that certain EHS clubs—the National Honor Society, California Scholarship Federation, Best Buddies Club, and Red Cross Club—were in compliance with the District policy as well as the requirements of the EAA and the First

---

[2] The list is comprised of the ASB, Academic Decathlon, Aspiring Authors, Band, Best Buddies, Brain Trust, Choir, Creative Impulse, California Scholarship Federation, Dance Company, Drama Club, Ecology Club, Film Club, German Club, Hip Hop, Japanese Club, Junior States of America, Leadership, Mock Trial, National Honor Society, Newspaper, Orchestra, PTSA, Red Cross, PAL, Students Making a Difference, United Nations, and Yearbook. (Index; Decl. of Jason Kaylor in Op. to Mot. for Prelim. Inj. ("Kaylor Decl.") ¶ 7.)

Amendment. (Smith Decl. 2 ¶ 5.) The District has rendered no opinion as to whether the other clubs at EHS are in compliance with the policy.[3]

### C. The Red Cross Club

EHS chartered Red Cross Club for the 2007-2008 school year and presumably will charter it for the 2008-2009 school year as well, as Dr. Smith has determined it complies with District policy. (Smith Decl. 2 ¶ 10.) The Red Cross Club is a chapter of a larger national and international organization of the same name. The club defines its purpose and relationship to the school curriculum as:

> "To promote a general understanding of the importance of personal health and well being. Red Cross Club informs and educates its members how to live safe, healthy . . . lives, and, more importantly, how to translate those lessons into improving the lives of others."

(EHS Red Cross Club Charter, 2007-2008 ("Red Cross Charter").) To these ends, the club held mandatory monthly meetings and required members to attend at least one Orange County Red Cross event per semester. (*Id.*) The club also conducted a spring bake sale to benefit its measles initiative, and a fall canned-food drive. (*Id.*) The District, in what it characterized as "a closer call," asserts that the club is connected to the EHS Health Education course, which includes lessons on "community health and safety, and emergency care, including first aid." (Smith Decl. 2 ¶ 10.) Additionally, the objectives of Health Education include "recognizing the interrelationship of the individual, society, and the environment" and promoting "positive health practices within the school and the community." (*Id.*)

---

[3] Dr. Smith also determined that three other clubs alleged to be out of compliance with District policy—the Interact Club, the International Club, and the Investment Club—did not have active chapters at EHS. (Smith Decl. 2 ¶ 4.)

### D. Students Making a Difference

For the 2007-2008 school year, EHS chartered SMAD. (Decl. of Jason Kaylor in Op. to Mot. for Prelim. Inj. ("Kaylor Decl.") ¶ 4.) The club disbanded due to lack of student interest in February, 2008. (*Id.*) Therefore, the school will not be sponsoring the club in 2008-2009. (*Id.*) SMAD's purpose was to "broaden student horizons by introducing them to various social, political, economic, and cultural issues from around the globe and cooperating/brainstorming to devise methods to alienate and confront such problems." (Kaylor Decl. Ex. 1, SMAD Club Charter ("SMAD Charter").) SMAD's service projects included raising money for malnourished children in Africa, and conducting toy drives and beach cleanups. SMAD members' required duties were to simply participate, contribute, and make a difference. (*Id.*) The District did not render an opinion as to whether SMAD violated its policy or was curriculum-based. However, even a cursory examination of the club's charter and its projects over the year reveals that the club was not curriculum-based and violated the policy.

### III. ANALYSIS

#### A. Standard for Preliminary Injunction

The criteria for issuing a preliminary injunction are:

> (1) the likelihood of the moving party's success on the merits;
> (2) the possibility of irreparable injury to the moving party if relief is not granted;
> (3) the extent to which the balance of hardships favors the respective parties; and
> (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief.

*Owner-Operator Ind. Drivers Ass'n, Inc. v. Swift Transp.* 367 F.3d 1108, 1111 (9th 2004).

### 1. Likelihood of Success on the Merits

The Bible Club is extremely likely to succeed on the merits of its case because the District has likely violated the Bible Club's rights under the EAA and the First Amendment of the United States Constitution.

### a) The First Amendment and Equal Access Act

Courts have long held that students retain their First Amendment while attending school. *See, e.g., Tinker*, 393 U.S. at 506. One of the most important rights protected by the First Amendment is to be free from government discrimination based upon the viewpoint expressed by one's speech. When a public entity creates a limited open forum, it is barred from discriminating against religious speech in favor of secular viewpoints. *See, e.g., Prince v. Jacoby*, 303 F.3d 1074, 1090-91 (9th Cir. 2002); *Widmar v. Vincent*, 454 U.S. 263 (1981). For example, in *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819 (1995), the Supreme Court held that a university's denial of money to a student religious newspaper from a campus fund set up by a college to help defray printing costs for student publications was unconstitutional viewpoint-based discrimination. The Supreme Court held:

> "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."

*Id.* at 829 (citations omitted).

Congress passed the EAA to codify and define high school students' First Amendment rights to form groups at school. The EAA states:

It shall be unlawful for any public secondary school which receives Federal

financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

20 U.S.C. § 4071(a). A school creates a limited open forum when it grants an opportunity for one or more noncurriculum-based groups to meet on school premises during noninstructional time. 20 U.S.C. § 4071(b). However, the EAA provides that it does not apply if a school must act to maintain order and discipline on school premises or protect the well-being of students and faculty. 20 U.S.C. § 4071(f).

The Supreme Court further interpreted the EAA's provisions in *Board of Education of the Westside Community Schools v. Mergens*, 496 U.S. 226 (1990). The *Mergens* Court ordered a school district to give equal access to a student Christian club under the EAA. *Mergens*, 496 U.S. at 253. The Supreme Court found that the school district in that case created a limited open forum when it sponsored noncurriculm related student groups like a chess club, a SCUBA diving club, and a community-service-oriented organization. The Supreme Court held that "the term 'noncurriculum-related student group' is best interpreted broadly to mean any group that does not *directly* relate to the body of courses offered by the school. *Mergens*, 496 U.S. at 239. The Supreme Court limited the qualifying relationship between a school's curriculum and a group's mission, stating that "a curriculum-related student group is one that has more than just a tangential or attenuated relationship to courses offered by the school." *Mergens*, 496 U.S. at 238. The Supreme Court identified four ways a student group could be directly related to a school's curriculum:

    (1)    the subject matter is actually taught, or will soon be taught in a regularly offered course;
    (2)    the subject matter of the group concerns the body of courses as a whole;
    (3)    participation in the group is required for a particular course; or

(4)  participation in the group results in academic credit.

*Mergens,* 496 U.S. at 239-40. A school need not let scores of noncurriculum-related groups on campus to trigger the limited open forum described in the EAA; all that is necessary for a school to trigger EAA protections is for it to merely admit one group that does not fit the definition above. *Mergens,* 496 U.S. at 227.

Appellate cases have further interpreted and applied the *Mergens* standards. In *Pope v. East Brunswick Board of Education,* 12 F.3d 1244 (3rd Cir. 1993) the Third Circuit held that the Key Club, a service organization affiliated with the Kiwanis, was not a curriculum-related student group. It held against the school district despite claims that the Key Club was related to social studies curriculum concerning homelessness, hunger, and poverty. Similarly, in *Prince v. Jacoby,* 303 F.3d 1074 (9th Cir. 2002), the Ninth Circuit held that World Changers, a student group committed to addressing student issues from a religious perspective, must be given the same rights and privileges as other student groups to comply with the EAA and the First Amendment. The Ninth Circuit invalidated a school district policy that granted religiously oriented student groups the right to meet during school hours, but kept them from receiving the same funding, supplies, and resources to which other non-religious groups were entitled. *Prince,* 303 F.3d at 1094.

### b) The District's Actions in Light of the Equal Access Act and the First Amendment

A school district violates the First Amendment and the EAA by refusing to grant equal access to religious and political student groups after it creates a limited open forum by admitting at least one noncurriculum-related student group onto its campus. It is extremely likely that EHS has done just this by chartering the Red Cross Club. Admitting that this club's relationship to the school's curriculum is "a closer call," the District argues that it is nonetheless related to the EHS Health Education class. (Smith

Decl. 2 ¶ 10.) It is related, the District argues, because both the Red Cross Club and the Health Education class focus on common goals generally related to health and well-being in the high school community and the community at large.

This relationship is insufficient to satisfy any of the four prongs of the *Mergens* test. The District has not shown that the subject matter of the Red Cross Club is "taught, or soon will be taught, in regularly scheduled course." *Mergens*, 496 U.S. at 239. If the Red Cross Club taught its members first aid, and the Health Education Class included a Red Cross first aid certification component, this might be a sufficient nexus for the Court to deem the club curriculum-based. However, the District has not presented such evidence. The lack of relationship between the Red Cross Club and the school's Health Education curriculum becomes even clearer when examining the club's actual practices. The club's activities include attending the EHS chapter's monthly meetings as well as one Orange County Red Cross meeting each semester. (Red Cross Charter.) Additionally, the club holds a food drive and a bake sale. (*Id.*) While all of the group's activities are laudable, none of them are likely to be taught in a health class.

Instead of showing that the Red Cross Club engages specific subjects that are taught in its Health Education class, the District has provided wispy descriptions of the goals of its health curriculum to compare with the club's equally gossamer objectives. This strategy typifies the "tangential or attenuated relationship" barred by *Mergens*. *Mergens*, 496 U.S. at 238. Similarly, the *Mergens* Court held:

> To the extent that petitioners contend that 'curriculum-related' means anything remotely related to abstract educational goals, however, we reject that argument. To define "curriculum-related" in such a broad way that results in almost no schools having limited open fora, or in a way that permits schools to evade the Act by strategically describing existing student groups, would render the Act merely hortatory.

*Mergens* 496 U.S. at 244. The Supreme Court interpreted the EAA to prohibit school administrators from crafting such strategic descriptions in order to choose groups based on the groups' religious or political viewpoints.[4]

The evidence here suggests the District has strategically approved or denied clubs' applications based upon their viewpoints. While the District stretches and contorts its description of the Red Cross Club and its definition of the health curriculum to allow the Red Cross to remain a part of the campus community, it denied the application of the Bible Club when portions of that club's discussions clearly cover material that is covered in its official curriculum. The first objective of the EHS World History class is to have "[s]tudents relate the moral and ethical principles in ancient Greek and Roman philosophy, in Judaism, and in Christianity to the development of Western political thought." (Kaylor Decl., Ex. 2, Historical and Social Studies Analysis Skills at 8 ¶ 10.1.) Assuming that the Bible is the basic text that provides insight into the moral and ethical principles of Judaism and Christianity, this portion of the World History curriculum is nearly identical to one stated purpose of the Bible Club. Like the World History class, the Bible Club sought to study the Bible and related pieces of literature for their import on history, language, arts, and government. (Proposed Charter.) If the Red Cross Club's general emphasis on healthy living is sufficiently related to the health curriculum to allow its certification as a curriculum-related club, then the Bible Club's study of a foundational text of Western Civilization certainly is. This incongruous interpretation of the *Mergens* rule suggests that the District is behaving strategically and discriminating against groups based upon their viewpoints.

---

[4] *See also Pope,* 12 F.3d at 1247, stating, "[u]nfortunately, ... such is the situation of this case. The East Brunswick School Board, unwilling to simply follow the Act and allow a voluntary religious group to meet, has searched the Act and scoured the language of *Mergens* itself for loopholes that would allow it to continue discriminating against voluntary religious groups."

Furthermore, evidence indicates that EHS only began to enforce its policy once it was confronted with a religiously based group. In the 2007-2008 school year, EHS admitted SMAD, a club with a purpose and duties so vague as to have no conceivable relationship to the school's curriculum. (SMAD Charter.) The District has not put forth any evidence that this club was related to the curriculum, merely stating that the group no longer exists. (Kaylor Decl. ¶ 4.) SMAD's charter suggests that the group is a purely service-oriented organization, and sets forth no explicit or implicit relationship to the curriculum. Both the Supreme Court and the Court of Appeals for the Third Circuit have held that purely service-oriented groups are not curriculum-based, and the inclusion of such groups results in an open forum. *See Mergens*, 496 U.S. at 246; *see also Pope*, 12 F.3d at 1253-54. The District admitted SMAD as a curriculum-related club for the 2007-2008 school year in the face of District policy to the contrary. Less than a year later, the District refused to admit the Bible Club despite its much clearer relationship to the curriculum. These actions further suggest that the District either began enacting its closed-campus policy in response to an application from a the Bible Club, or has been strategically determining whether groups are curriculum-based in order to pick and choose which groups, and which viewpoints, it wants represented on campus. Either way, the District is engaging in government viewpoint discrimination: behavior barred by the EAA and the First Amendment.

A district's sponsorship of only one noncurriculum-based group is sufficient to trigger the EAA and open a campus up to all diverse viewpoints. Here, the District has admitted the Red Cross Club, whose purported relationship to EHS' health education is tenuous, at best, and possibly does not exist at all. Moreover, the District's behavior previous to the Bible Club's application suggests that it only began enforcing its policy when it was faced with an application from a religiously oriented group. Such strategic behavior and viewpoint discrimination in a limited open forum is an anathema to the

EAA and the First Amendment.

### 2. Possibility of Irreparable Injury

No further showing of irreparable injury is necessary when the moving party has shown a probable violation of constitutional rights. In First Amendment cases, the presumption in favor of irreparable harm is particularly strong, as "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of the issuance of a preliminary injunction. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Here, it is likely that the District and EHS have violated the Bible Club's First Amendment rights by favoring secular expression over religious expression and denying the Bible Club the forum which it is due. EHS' initial denial of the Bible Club's application prevented its members from making preparations for club activities for the upcoming school year. Because school at EHS is scheduled to start in a matter of days, keeping the group off campus at this important time might further sabotage its efforts to recruit students when they are most available, permanently stunting the size of the group's membership. The Bible Club's ability to exercise its First Amendment rights to associate freely and to share its thoughts among receptive students has already been irreparably hampered, and it will be further harmed if the Bible Club is not allowed access to the open forum at the beginning of school.

This dispute's high-school setting creates harms aside from the damage to the Bible Club's First Amendment rights. Because R.G. will be a junior in high school, her opportunity to serve as the EHS Bible Club's president is fleeting. To decrease the amount of time further while she is embroiled in litigation might rob her of the opportunity to lead a club in high school. Monetary compensation or declaratory relief awarded months or years from now is unlikely to repair the damage of missed opportunities for R.G. to fully participate in the high school experience.

### 3. The Balance of Hardships

The balance of hardships also favors the Bible Club. Because, as discussed above, the clock is ticking down on their high school years, the Bible Club's members have an urgent interest in making the most of their adolescence. The District argues that giving the Bible Club equal access could result in the creation of an open forum, opening the floodgates for other clubs that would dilute the school's resources away from curriculum-related clubs, compete for student attention, and stretch staff and faculty time to monitor the diverse meetings. The District's argument is misplaced; issuing an injunction would not result in the establishment of a limited open forum at EHS. EHS has already likely established such a forum already by admitting the Red Cross Club among others. Even if the concerns over the dilution of resources were valid, the Court has not been presented with evidence that there are a great number of noncurriculum-based clubs waiting to storm EHS' gates. It can only act on the record before it and consider only the possible hardship caused by granting the Bible Club equal access.

The Club has already acquired a faculty sponsor and appears to have objectives that are little different than those of other clubs admitted in the past. Therefore, it appears that the District will suffer limited hardship from granting equal access to the Bible Club. Furthermore, the members of the Bible Club will suffer hardship if the District continues its denial of equal access to its limited open forum. The Bible Club members' First Amendment rights to associate at school will be hampered. The club will miss its best opportunity to recruit members and become viable if it is unable to gain access at the beginning of the school year. Additionally, if the Bible Club's status is unclear in these few days leading up to the beginning of school, it may be difficult for the club to adequately prepare for its activities throughout the year, further harming its members' ability to exercise their First Amendment rights. Given these facts before the Court, the balance of the hardships tips strongly in the Bible Club's favor.

### 4. The Public Interest

In cases where the public interest is implicated, a court should determine whether the public interest favors the granting of an injunction. *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002). This inquiry primarily addresses the effects of injunction on non-parties. *Id.* The public interest is clearly implicated in this case because it involves the expenditure of taxpayer money and public resources, the exercise of constitutional and constitutionally related rights, and the education of children at the cusp of adulthood. The District, by denying the Bible Club's application, might have chilled the desires of other students to form similar religiously and politically oriented clubs. Additionally, the public interest in adolescents' education is particularly strong, because in a few short years, EHS students will be adult members in our society and, hopefully, participants in our democracy.

It is the District's position that the issuance of this injunction would harm the public's interest in providing an effective education for these budding citizens. Preventing the Bible Club and groups like it from meeting on campus during the day, the District argues, serves important purposes that are directly related to the educational function of the school. The District claims that giving the Bible Club and others like it equal access would usurp the District's control of limited resources and facilities even though the District is in the best position to determine how resources are used to maximize the effectiveness of the school's curriculum. (Def.'s Mem. at 6.) The District predicts that allowing the Bible Club and others on campus would dilute the potential enrichment provided by clubs related to the curriculum as curriculum-based clubs would be forced to compete with noncurriculum-based clubs for students' time and attention. (*Id.*) The District also claims that by keeping a clamp on noncurriculum-based clubs, it avoids having to provide supervision for myriad uses of school facilities. (*Id.*) Laying aside the fact that these arguments address the imaginary situation of a school overrun with student groups that is unsupported by the record before the Court, it is clear that the

District's desire to keep a closed forum is actually contrary to the public interest, undermining its educational function.

The Supreme Court has recognized that one of public education's primary functions is to educate the young for citizenship. *See Tinker*, 393 U.S. at 508. An important—perhaps the most important—duty of a citizen is to choose among competing views and information and make reasoned decisions based upon those views. To that end, schools must provide a microcosm of society, along with the freedom for students to be exposed to diverse and challenging views and choose between them. *Id.* The District's objections seem to be based, at least partially, on a paternalistic desire to control the views and outlets available to students during the day. Funds, staff, and student attention are limited; the District insists that it is the only entity capable of wisely distributing these resources to shape young minds.

The District has indicated, both in its moving papers and in its remarks to the Court, that it desires to keep EHS a closed forum at any cost, regardless of whether it must bar positive groups such as the Red Cross Club in order to do so. The Court fails to comprehend the District's zeal to maintain such tight control. The District has not shown how granting access to myriad diverse clubs would harm its educational mission. Although it states that new clubs could distract student attention from curriculum-based organizations, this contention is based upon mere speculation.[5] It seems equally likely that additional student-initiated clubs could distract student attention from other things outside of school: minor distractions like television, video games, and the Internet, or major destructive influences such as the pervasive pull of violent street gangs and drugs. Clubs like the Red Cross Club provide an outlet and sense of belonging for community-minded youths regardless of whether the groups are related to the curriculum. They

---

[5] Additionally, both the EAA and First Amendment jurisprudence allow schools to censor speech and remove clubs that distract from the school's educational mission. 20 U.S.C. § 4071(f).

provide opportunities for students to do charity and to connect to the larger community. Religiously or politically oriented clubs like the Bible Club offer students a new perspective through which to interpret the curriculum as well as a reason to be involved in school past the last class bell rings.

With all due respect, the Court cannot accept the District's claim that granting equal access to the Bible Club and others like it would harm EHS' educational function. It seems the opposite is true. These groups do good work. If the District eliminates noncurricular clubs in order to maintain a closed forum at EHS, it will be undermining the public interest and its own educational mission.


## IV. CONCLUSION

For the foregoing reasons, the Court will issue a preliminary injunction directing the District to grant Bible Club the same access to EHS facilities and resources enjoyed by other clubs, including the rights to: (1) conduct meetings during non-instructional time on campus; (2) list the club in the EHS yearbook with an accompanying photo; (3) list the club on the EHS Web site and in the EHS Student/Parent Handbook with an accompanying photo; (4) have access to an advisor; and (5) have access to District resources, including equipment, supplies and funding.[6]

DATED: August 28, 2008

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[6] The Bible Club's requests the Court waive the requirement of bond. In *Jergensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003), the Ninth Circuit held that a court may dispense with the filing of a bond when there is no realistic likelihood of harm to the defendant. In *Doctor John's, Inc. v. Sioux City*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa 2004), the Court found held that "requiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because the rights potentially impinged by the governmental entity's actions are of such gravity that protection of those rights should not be contingent upon an ability to pay." Given that this case involves the probable violation of the Bible Club's First Amendment rights, and that the damages to the District of issuing this injunction seem minimal, if they exist at all, the Bible Club need not post a bond.